817 So.2d 768 (2002)
Burley GILLIAM, Appellant,
v.
STATE of Florida, Appellee.
Burley Gilliam, Petitioner,
v.
Michael W. Moore, etc., et al., Respondents.
Nos. SC00-1438, SC95370.
Supreme Court of Florida.
February 7, 2002.
Rehearing Denied May 23, 2002.
*770 Neal A. Dupree, Capital Collateral Regional Counsel, and Dan D. Hallenberg, Assistant CCRC, Office of the Capital Collateral Regional CounselSouth, Fort Lauderdale, FL, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Lisa A. Rodriguez, Assistant Attorney General, Miami, FL, for Appellee/Respondents.
PER CURIAM.
Burley Gilliam, an inmate under sentence of death, appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the denial of Gilliam's postconviction motion and deny the petition for habeas corpus.

I. PROCEEDINGS TO DATE
In 1988, Gilliam was convicted of the first-degree murder and sexual battery of Joyce Marlowe.[1] In brief, the evidence established the following:
The victim, Joyce Marlowe, was last seen alive on the evening of June 8, 1982, in the company of appellant. That same evening, Burroughs, fishing on a lake, heard a woman screaming. When he arrived on shore, he found a truck (later identified as the one Gilliam was driving) stuck in the sand, and its driver acting "very very nervous," but otherwise sober and normal. The next day Burroughs noticed that the lake area was roped off, and was told by police that a woman had been raped and murdered.
Appellant gave several accounts of his activities on the day of the murder to Detective Merrit, and in so doing stated that he and the victim were swimming in the lake and he ducked her under too long; he attempted resuscitation, but was unsuccessful.
Gilliam v. State, 582 So.2d 610, 611 (Fla. 1991). The physical evidence, however, was inconsistent with this account. Marlowe was raped and strangled:
The victim sustained brutal injuries. The medical experts testified that death was caused by strangulation; the victim had injuries to her face, neck, breast, shins, arms, rectum, and vagina; she had bruises from being grabbed; one of *771 her nipples was almost bitten off by appellant; from the anal rape there were tears extending through the anal and rectal region, including into the skin surrounding the anus (where, in the words of the trial judge, she was in effect torn apart); there was hemorrhaging from the vagina to the neck of the urinary bladder; and the victim was alive when these injuries were inflicted.
Id. Marlowe worked at the Orange Tree Lounge, a topless bar, as a dancer. The bar's manager, Katherine Gordon, testified that on the night of the murder she was working a double shift and desired to leave the bar in between shifts to get something to eat. According to Gordon, Gilliam offered to drive Marlowe to a nearby restaurant and she eventually left the bar with him. Her body was discovered the following day.
Gilliam employed an insanity defense, arguing that he committed the rape and murder during an epileptic seizure. In support of that claim, he presented the testimony of his sister, brother-in-law, and nephew, all of whom recounted instances in which they observed Gilliam suffer what they believed to be seizures. Several of Gilliam's family members also testified relative to childhood abuse in an attempt to substantiate his claim that his seizure disorder was the result of severe head trauma. Dr. Arthur Stillman, a forensic psychiatrist, opined that Gilliam could have murdered and raped the victim during an "epileptic furor." On the basis of Gilliam's history of seizures, Dr. Stillman further opined that Gilliam's seizure disorder prevented him from understanding the nature and consequences of his actions at the time of the murder. Gilliam took the stand in support of his defense and claimed that he could not remember how he arrived at the lake with the victim or any of the events thereafter.
On February 25, 1993, Gilliam filed his initial 3.850 motion with leave to amend pending the satisfaction of several outstanding public records claims. Gilliam eventually amended the motion, raising twenty-three claims[2] all of which the lower court summarily denied save for his claim of ineffective assistance of counsel during the penalty phase. Following an evidentiary hearing, the lower court denied Gilliam's claim of ineffectiveness during the penalty phase.
Gilliam now appeals the denial of the issues he raised in his postconviction motion.[3] *772 Gilliam has also filed a petition for writ of habeas corpus raising four claims.[4]

II. 3.850 APPEAL
The bulk of Gilliam's claims are procedurally barred[5] or without merit.[6] As to those claims which warrant discussion, we first address the guilt phase.

A. Guilt Phase Claims
Gilliam claims that defense counsel, Edward Koch, was ineffective in revealing to the jury Gilliam's 1969 conviction for rape in Texas. In his opening argument to the jury, Koch made the jury aware of Gilliam's prior conviction, representing that it was for statutory rape:
At the age of 20, you will learn that he fell in love. He found someone that he felt loved him. There was, however, a big problem. At that time Burley was 20, going on 21. The girl was 15. The girl was underage. And at some point her parents found out about it. She told them Burley is the guy. Burley got arrested, and at the age of 20, 21, was sentenced to 15 years in Texas State Prison for the charge of statutory rape.
Again sexual intercourse with someone underage. 21 years old, Texas State Prison, 15-year sentence.
Consistent with this representation, Gilliam testified at trial that the 1969 rape conviction arose from consensual sex with a fifteen-year-old girl named Vida Lester. *773 During the State's cross-examination, Gilliam denied that he violently raped Lester.[7]
In its rebuttal, the State called Joseph Poe, a Texas detective who investigated the Lester rape. Detective Poe indicated that Lester had bruises on her neck and a black eye when she reported the rape.
As to this claim the lower court concluded that Koch made a strategic decision to reveal the prior rape conviction to the jury rather than have the State bring it out: "[T]he determination to bring out the rape conviction was a strategic call on the part of the defense and was not a decision which fell below acceptable professional standards. Therefore, it was not prejudicial under the Strickland test." The record supports the lower court's finding that defense counsel made a strategic decision, notwithstanding the fact that counsel was apparently mistaken relative to the factual circumstances attending Gilliam's 1969 conviction for rape.
Following Gilliam's testimony at trial, the State notified the defense that it was amending its rebuttal witness list to include detectives who investigated the 1969 rape case. Before Detective Poe eventually testified, the defense raised a discovery violation at which time the State argued that everything in the file of the 1969 conviction indicated that the rape was violent and that such information was available to the defense since 1982 prior to Gilliam's first trial:
First of all, starting from the beginning, the State has had in its possession since before the first trial the file of the Texas rape case.
Everything in that file indicates that the defendant violently raped a 15-year-old who was a complete stranger to him. There is no indication in the file that the defendant, or anyone else, has ever claimed otherwise.
At the prior trial during the sentencing phase the State introduced the evidence for the conviction of the rape in the Texas case.
. . . .
We would suggest to this Court that defense counsel had to know that Mr. Gilliam's account of what happened in Texas was subject to dispute, and we point out that Defense counsel, in their case, has gone to Texas on certain occasions. The file in this case is easily obtainable in Texas.
The State further argued that the report indicating that the rape was violent was given to Gilliam during his first trial, but Koch denied receiving the report.[8] This led the trial court to observe:
Now, what I think has really happened here is that Mr. Gilliam has probably been a little less than candid with his Defense team and all of a sudden, he puts in issue, by his testimony, that this was statutory rape and the clear inference was given to the jury that the only reason he went to prison was simply because the girl was 15 years old.
The record supports the trial court's conclusion that counsel made a strategic decision to reveal the 1969 rape based upon his understanding of the facts surrounding the *774 rape, facts that have now been challenged by the State.
Gilliam's claim of prejudice is also unavailing. Gilliam argues that the admission of the rape conviction had a devastating impact on the credibility of the defense's expert on epilepsy, Dr. Stillman. Specifically, Gilliam claims that Dr. Stillman's credibility rested heavily on his own which was damaged considerably by the revelation that his rape conviction was not the product of consensual sex with a minor. Our review of the record reveals that, even absent the admission of the rape conviction, Dr. Stillman's testimony was substantially discredited by the State. The State effected a compelling cross-examination of Dr. Stillman, during which it became apparent that his expertise in the field of epilepsy was subject to challenge. Dr. Stillman was uncomfortable and unfamiliar with many of the recent developments in the field of epilepsy as much of his testimony was grounded on literature and anecdotal evidence collected roughly twenty to thirty years earlier. Indeed, Dr. Stillman had not done any research or written any articles on epilepsy. Moreover, the thrust of his opinion was seriously eroded by the State's experts, Drs. Hendrick Dinkla and B.J. Wilder.
Dr. Stillman opined that Gilliam could have raped and murdered the victim during an epileptic furora subspecies of psychomotor seizures. Drs. Dinkla and Wilder, however, testified that there was no documented proof that a patient could "perform complex goal-directed motor activities during a seizure." Moreover both Dinkla and Wilder testified that seizures tend to be stereotypic, i.e., they are similar in character from one to the next. Importantly, both Dinkla and Wilder indicated that, assuming that Gilliam in fact suffered seizures previously, the descriptions given by Gilliam's family members as to his alleged seizures were inconsistent with the complex-partial seizure Dr. Stillman opined Gilliam suffered on the night of the murder.[9]
Further, the observations of the witnesses who encountered Gilliam on the night of the murder were inconsistent with Gilliam's own representations of his condition. Gilliam testified that he remembered awaking at the lake thinking that he had suffered a seizure. According to Gilliam, his muscles ached and he had urinated on himself. The State's expert, Dr. Dinkla, testified that people suffering seizures are generally unable to interact with their environment and often lose control of their bladders. Nevertheless, Sandy Burroughs, who encountered Gilliam shortly after hearing a woman's screams at the crime scene, observed nothing unusual about Gilliam's appearance or actions. Others who encountered Gilliam shortly after the crime, including Alfred Morris and Armando Rego, testified similarly.[10]
Finally, Gilliam's credibility was gutted by the introduction of his initial statements to police. Although Gilliam testified that he could not remember harming the victim or how he arrived at the crime scene, he initially told police that he accidentally drowned the victim.[11]
In Gilliams' sixth claim of error, Gilliam contends that counsel was ineffective in *775 failing to investigate and discover evidence of voluntary intoxication. The lower court summarily denied this claim as without merit: "As concerns the voluntary intoxication claim, the court determines that there was evidence adduced at trial as to voluntary intoxication, and this claim is without merit." The lower court's conclusion is amply supported by the record as counsel presented evidence of Gilliam's intoxication on the night of the murder as well as his history of drug and alcohol abuse.
First, the defense produced the testimony of Jeffrey Sherrie, who sat next to Gilliam at the Orange Tree Lounge. Sherrie testified that Gilliam drank for two to three hours and appeared intoxicated. Counsel emphasized Sherrie's testimony during closing argument. Further, Gilliam testified that just prior to arriving at the Orange Tree Lounge, he consumed "about a third of a fifth of Jack Daniels and a six pack of Budweiser," while at a truck stop. Gilliam also indicated that he had taken his seizure medication and was feeling "high." Additionally, Dr. Stillman testified as to Gilliam's alcohol and drug abuse, stating that Gilliam "used as many as 12 quaaludes a day for about four or five years and he drank as much as a fifth of whiskey a day." In sum, Dr. Stillman opined that Gilliam's drug abuse exacerbated his seizure disorder. Further, the State's own expert, Dr. Charles Mutter, testified that Gilliam was dependent on drugs and alcohol.
Moreover, counsel requested and the jury received an instruction on voluntary intoxication. Accordingly, the record conclusively refutes any claimed deficiency on counsel's part, as Koch presented and developed testimony of Gilliam's intoxication on the day of the murder.
In his seventh claim on appeal, Gilliam argues that counsel was ineffective in failing to obtain a competent mental health expert and failing to provide that expert with the materials necessary to perform a competent mental health evaluation. Gilliam's claims are conclusively refuted by the record.
Dr. Stillman testified on the strength of a personal interview with Gilliam, during which time he prepared Gilliam's personal history. Following his interview with Gilliam, Dr. Stillman testified that defense counsel provided him with and he reviewed several of Gilliam's hospital records. Dr. Stillman further indicated that he read statements and depositions of several family members regarding Gilliam's alleged seizures.
Dr. Syvil Marquit, a clinical psychologist, testified at the evidentiary hearing on the basis of an extensive psychological evaluation. Dr. Marquit also indicated that he interviewed family members in preparing Gilliam's personal history, and also reviewed the reports prepared by several of the State's experts.
In his eighth claim Gilliam alleges that either the State violated Brady or counsel was ineffective for failing to discover police reports allegedly indicating that the victim was a prostitute. The lower court denied this claim, finding that Gilliam failed to demonstrate that the police reports were suppressed by the State or that the failure to possess the evidence prejudiced Gilliam's case:
The Defendant has failed to show that he did not possess this information nor how it could have brought about a different result at trial. In this case, the defendant did not claim that he did not commit the crime but rather that he should not have been held criminally responsible. Therefore, having failed to meet the "Brady" test, the defendant *776 has failed to show prejudice on this point.
We agree. Even assuming that the State withheld evidence that the victim was a prostitute, such evidence would have been wholly irrelevant to the defense's theory that Gilliam murdered the victim during a seizure. Furthermore, the instant evidence would not have been admissible under the Rape Shield Law, section 794.022, Florida Statutes (1987).[12]
Gilliam's ninth claim is that counsel was ineffective in failing to request a jury instruction that epileptic seizures can negate specific intent. Gilliam's claim is without merit.
The defense requested and the jury was instructed on the insanity defense. That instruction clearly accommodated Gilliam's specific defense based on his epileptic state.
In his tenth claim, Gilliam argues that counsel was ineffective in failing to object to the testimony of Detective Poe on hearsay grounds. The lower court denied this claim, finding that the record conclusively refuted Gilliam's claims of deficient performance and prejudice. Our review of the record leads us to the same conclusion.
Before Poe took the stand, defense counsel succeeded in having the trial court instruct Poe that he could not testify as to the substance of any conversations he had with Lester. As a result, Poe's testimony was rather circumscribed. On the brief occasion in which the State elicited hearsay testimony from Poe, defense counsel objected. Accordingly, there is no viable claim of deficient performance as counsel objected to the hearsay testimony Gilliam argues was improperly admitted. Moreover, to the extent Gilliam is attempting to reach the merits of the trial court's ruling on the admissibility of the instant evidence by couching his claim in terms of ineffective assistance of counsel, we deny Gilliam relief. See Valle v. State, 705 So.2d 1331, 1337, n. 6 (Fla.1997); Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995); Medina v. State, 573 So.2d 293, 295 (Fla.1990).

B. Penalty Phase Claims
Gilliam asserts that trial counsel erred in failing to present to the penalty phase jury mitigating evidence that he later presented to the judge at the sentencing hearing. At the penalty phase, before the jury, Koch relied on guilt phase testimony from several of Gilliam's family members:
Koch: Your Honor, we have no additional testimony to present. We likewise would be relying on the testimony of Kay Salem, John Beagle, Fay Beagle, and Dean Wilkins [sic].[13]
*777 Gilliam's mother, Ludine Wilkins, and sisters, Cecil Faye Beagle and Kay Salem, testified during the guilt phase that Gilliam's stepfather brutally beat him as a child. This testimony was admitted in support of Gilliam's claim that his epilepsy was the result of long-standing head trauma. Moreover, John Beagle, Gilliam's brother-in-law, testified to an incident in which he observed Gilliam suffer what he believed to be a seizure.
During Koch's penalty phase closing argument, he briefly referred the jury to the guilt-phase testimony from Gilliam's family:
Koch: I want to address you briefly about this aspect of the case; much of what we want to present to you was presented to you through the testimony of some of Burley's family members, who testified earlier. I guess under the law, those are called mitigating circumstances, it gives you an idea to learn a little bit about Burley. But, at this juncture, having found him guilty of First Degree Murder, frankly, the responsibility you have is to determine what is necessary to protect all of us, that includes everyone here in this Courtroom.
Following the jury's ten-to-two death recommendation, Koch requested that the trial court continue the sentencing hearing to allow the defense to present additional testimony. The trial court granted the continuance and the sentencing hearing was eventually held nearly a month later.[14]
At the sentencing hearing, Koch presented the testimony of forensic pathologist, Dr. Ronald Reeves, to rebut the evidence supporting the HAC aggravator. Dr. Reeves testified that the victim suffered several head injuries which could have rendered the victim unconscious. He further opined that there was no scientific way to determine whether the victim was conscious at the time she sustained many of her injuries and also testified that he could not conclusively determine whether strangulation was the cause of death. During cross-examination, the State significantly impeached Dr. Reeves' credibility by revealing, among other things, that he had been fired from a previous post at a medical examiner's office.
In addition to Dr. Reeves, Koch also presented Dr. Marquit who, based on an interview with Gilliam and information received from his family, testified as to Gilliam's abusive upbringing, childhood ailments, and apparent learning disability. Dr. Marquit opined that Gilliam never had a chance for a decent life. On cross-examination, however, he admitted that he was unaware of Gilliam's documented abuse of his ex-wife and son, conceding that such information could have affected his opinion of Gilliam.
Along with this expert testimony, Koch presented testimony from several of Gilliam's family members, many of whom testified during the guilt phase. Gilliam's seventeen-year-old nephew, Lloyd James Fanchese, and two of his sisters, Kay Salem and Cecil Fay Beagle, testified relative to Gilliam's positive influence on their lives. Ludine Wilkins, Gilliam's mother, also testified as to his childhood difficulties and ailments, and his nonviolent and *778 helpful nature as a child. Gilliam's wife, Cindy, characterized Gilliam as a compassionate person and indicated that Gilliam previously abused drugs and alcohol.[15] Near the end of the sentencing hearing, the State admitted certified copies of HRS records documenting Gilliam's abuse of his son as well as several letters from Gilliam's ex-wife indicating that she was abused by Gilliam.[16]
After the presentation of the above testimony, the court inquired into Koch's reasons for choosing to forego the presentation of this evidence to the jury. Koch explained that his decision was based on his sense of the jury and his understanding of the judge's role in sentencing:
The Court knows from its days when it was trying cases that a lawyer, an experienced lawyer, [who] goes ahead and picks a jury and goes ahead and tries a particular case in front of a jury, speaks to the jury in a closing argument [h]as a sense of the jurors.
I had a sense of this particular jury.
That's why I needed to and that's why I did rely on provision that is specifically contemplated by the Florida Supreme Court as it relates to your role. And that is that a judge's role is primarily to ensure that the jurors adhere to the law, and protects against a sen[tence] resulting from passion rather than reason.
With your Honor's experience, both as a prosecutor and as a trial judge, I felt that this put you in a rather unique position relative to a lay jury in an effort to be able to assess the gravity of this offense, to assess the defense and to assess the human being, this individual who is before the Court.
At the evidentiary hearing Koch again explained that his decision to forego the presentation of mitigating evidence to the jury during the penalty phase was due to his sense that the jury would be unreceptive to the evidence he subsequently presented to the judge:
It was obvious to me in context of what occurred during the trial and from my sense of the jury, that they were not highly to be receptive to mitigation evidence that we had for [the] penalty phase. In other words, it was obvious to me at that point, at least I sensed, that the jury was likely to return a death recommendation.
Koch, however, did not characterize this decision as a strategic one:
Q. Was your sense of the jury, was your sense of the jury a tactical decision?
A. No, not really. In the context of what happened, I just in essence gave up on the jury, and again, there may, this is somewhat out of context because we don't have a two week trial and you don't have the sense of what the jury [was] non verbally conveying [sic] to me, but in essence, I gave up on the jury, in the sense that I didn't feel in light of what had gone on before that there was much likelihood that they would be receptive to mitigation testimony, and that they would probably return a death recommendation.
In sum, Koch characterized his decision to present mitigating evidence to the judge in lieu of the jury as a "desperate attempt to get a life recommendation."
*779 The lower court found no deficiency in counsel's performance, finding Koch's decision to forego the presentation of mitigating evidence to the jury a matter of strategy:
It is clear than [sic] that Mr. Koch thought about the decision not to present these witnesses to the jury in this cause. He obviously felt that under the circumstances to do so would have been fruitless. His feeling was that this evidence might be better received by the sentencing Judge in light of the fact that his jury had just heard a great deal [of] evidence against Mr. Gilliam and determined him to be guilty of first-degree murder.
The court determines this to be a judgment call on the part of Mr. Koch and therefore does not find this to rise to the level of ineffective representation by counsel!
Having determined that trial counsel's performance did not fall below reasonable professional standards, the Court need not reach the prejudice prong of Strickland, supra.
For Gilliam to succeed in his claim he "must demonstrate that counsel's performance was deficient and that counsel's deficient performance affected the outcome of the sentencing proceedings." Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995). To establish the requisite prejudice Gilliam "must demonstrate that but for counsel's errors he would have probably received a life sentence." Id.
The testimony of Dr. Reeves offered at the sentencing hearing to rebut the HAC aggravator did not significantly contradict the testimony of the State's medical examiner, Dr. Valerie Rao. The thrust of Dr. Reeves' testimony was that it was impossible to determine whether the injuries supporting a finding of HAC were inflicted while the victim was conscious. Dr. Rao testified similarly during the guilt phase, wherein she conceded that she could not conclusively determine whether the victim was conscious at the time the various injuries were inflicted. We affirm the trial court's conclusion that there was ample evidence that the victim was conscious while she was brutally raped. Dr. Rao identified several injuries on the victim's arms and legs, which were consistent with her being restrained while she was raped. Moreover, Dr. Richard Souviron, an expert in forensic dentistry, testified that the pattern of bite marks on the victim's breast indicated that she was more than likely moving at the time the injury was inflicted. Further, Sandy Burroughs, who was fishing at the crime scene on the night of the murder, testified that he heard the screams of a woman for several minutes at about the time the victim is presumed to have been murdered. Finally, as discussed previously, Dr. Reeves was significantly discredited by the State. Indeed, the trial court did not find Dr. Reeves' testimony compelling: "The court finds that the testimony of Dr. Reeves is deserving of very little weight and does not place into doubt the testimony of Dr. Valerie Rao which supports the Court's finding."[17]
*780 The remaining testimony presented at the sentencing hearing was of dubious value. Much of Dr. Marquit's testimony concerning Gilliam's abusive childhood was cumulative to testimony given by Gilliam's family during the guilt phase. The remaining evidence came from essentially the same family members who testified during the guilt phase and was directed at depicting Gilliam as a compassionate and loving family man.[18] Had the jury been exposed to that testimony they would have likewise been exposed to evidence that Gilliam abused his ex-wife and son. In fact, the trial court rejected much of this attempted mitigation on that ground: "The Court specifically rejects as mitigation the defendant's assertion that he is a nonviolent person and a loving parent to his son. To the contrary, the Court is convinced that the defendant is an extremely violent person, and that his son has been a victim of violence." Ineffective assistance of counsel claims are mixed questions of fact and law and while this Court will give deference to the trial court's factual findings, it performs an independent review of both the deficiency and prejudice prongs. See Valle v. State, 778 So.2d 960, 966 (Fla. 2001). In performing this review in the instant case, we are not convinced that counsel's decision not to present evidence to the penalty jury that was later presented to the sentencing judge was an error so serious that counsel was not functioning as "counsel" guaranteed to the defendant by the sixth amendment and that counsel's deficient performance was so serious as to deprive the defendant of a fair trial. It is clear from his testimony that counsel felt the jury would be unreceptive to the evidence presented to the judge and would be likely to return a death recommendation. Gilliam has failed to demonstrate that he suffered prejudice or that counsel's performance was deficient under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
In his third claim Gilliam argues that counsel was ineffective in failing to investigate and present additional mitigating evidence concerning his substance abuse and abusive childhood. During the evidentiary hearing, Gilliam attempted to present the testimony of Drs. Hyman Eisenstein and Milton Burglass in support of this claim. The lower court reiterated that it had not granted an evidentiary hearing on this issue, explaining that Gilliam made no showing that these experts were available to trial counsel or that trial counsel even knew of their existence. Accordingly, the court held that the experts were not properly before it at the evidentiary hearing. Nevertheless, the lower court allowed collateral counsel to proffer the testimony of Drs. Eisenstein and Burglass.
In his proffer, collateral counsel indicated that Dr. Eisenstein, a neuropsychologist, would have testified relative to Gilliam's abusive childhood and that Gilliam suffers from organic brain damage and "a whole host of psychological problems." Dr. Eisenstein would have further testified that due to these problems, Gilliam was under the influence of extreme mental or emotional disturbance and his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired.
Counsel represented that Dr. Burglass would have testified that at the time of Gilliam's arrest he met the criteria for speed, cocaine, and alcohol dependence *781 and that he had a history of drug and alcohol abuse dating back to his youth. Counsel's proffer indicated that both Dr. Burglass and Dr. Eisenstein would have testified at the hearing that they were available to testify at Gilliam's penalty phase.
Much of the substance of the testimony proffered on behalf of Drs. Burglass and Eisenstein was in fact presented to the jury through Gilliam's testimony, along with that of his family and various experts. In fact, Dr. Stillman opined that Gilliam's drug and alcohol abuse exacerbated his seizure disorder and further indicated that Gilliam had some organic brain damage and did not know the nature and consequences of his actions at the time of the murder. Accordingly, the record conclusively refutes any claim of prejudice, as the substance of the testimony of Drs. Burglass and Eisenstein would have been largely cumulative. See Downs v. State, 740 So.2d 506, 516 (Fla.1999) (affirming trial court's denial of defendant's claims that counsel was ineffective for failing to investigate and present additional mitigating evidence where the additional evidence was cumulative to that presented during sentencing); see also Rutherford v. State, 727 So.2d 216, 224-25 (Fla.1998); Valle, 705 So.2d at 1334-35.
In his fifth claim on appeal Gilliam contends that Koch's penalty phase closing argument was deficient in that it failed to specifically address the aggravating and mitigating circumstances. Contrary to this assertion, the record reveals that Koch did address the mitigating circumstances, referring the jury to the testimony of Gilliam's mother and siblings and the type of upbringing that he had. Counsel urged the jury to consider this testimony when it considered the appropriate punishment for Gilliam, asserting that Gilliam was not a survivor like the rest of his family and could not respond as constructively. While Koch's closing did not specifically address the aggravating circumstances, we do not find that this decision was so unreasonable as to constitute deficient performance.[19]
Finally, Gilliam raises what is in essence a variant of the cumulative error claim he raised below. To the extent Gilliam seeks review of that claim, he is not entitled to relief as his individual claims of error are without merit. See Bryan v. State, 748 So.2d 1003, 1008 (Fla.1999) ("[W]here allegations of individual error are found without merit, a cumulative-error argument based thereon must also fail.").

III. HABEAS CORPUS
We deny the claims raised in Gilliam's petition for habeas corpus as they are procedurally barred or without merit.[20]
*782 Accordingly, we affirm the lower court's denial of Gilliam's 3.850 motion for postconviction relief and deny the petition for habeas corpus.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, and LEWIS, JJ., concur.
QUINCE, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
ANSTEAD, J., dissents.
QUINCE, J., concurring in part and dissenting in part.
I agree with the majority except to the extent of the denial of relief based on ineffective assistance of counsel at the penalty phase. Based on this record, I can discern no strategic reason for trial counsel's failure to present mitigating evidence to the penalty phase jury.
This case was defended on the theory that Gilliam had an epileptic seizure, that the murder was committed during the epileptic seizure, and that Gilliam, because of the seizure, was insane at the time he committed the rape and the murder. Although the jury was not convinced that Gilliam was insane, there was evidence presented that various people had observed Gilliam during instances where he appeared to be having a seizure. Additionally, there was testimony concerning *783 physical abuse and that the seizures were the result of head trauma. While defense counsel mentioned this evidence during the penalty phase, these witnesses were not presented during the penalty phase. Defense counsel likewise did not present his expert witnesses, Drs. Reeves and Marquit, to the jury but offered their testimony at the sentencing hearing, before the trial judge only.
At the evidentiary hearing, trial counsel explained his actions by indicating that his sense of the jurors was they would not be receptive to this information. In fact defense counsel said he "gave up on the jury." Not only did defense counsel give up on the jury by not presenting it with evidence with which it could make a rational decision on the issue of life and death, counsel's argument on the same issue seems more directed to protecting the public than protecting the life of his client when he gave short shrift to the defense evidence by saying:
I want to address you briefly about this aspect of the case; much of what we want to present to you was presented to you through the testimony of some of Burley's family members, who testified earlier. I guess under the law, those are called mitigating circumstances, it gives you an idea to learn a little bit about Burley. But, at this juncture, having found him guilty of First Degree Murder, frankly, the responsibility you have is to determine what is necessary to protect all of us, that includes everyone here in this Courtroom.

(Emphasis added.) The fact that the jury did not use the testimony from the family members to acquit or find the defendant not guilty by reason of insanity does not in my estimation give counsel a reason to negate its potential for mitigation in the penalty phase.
In addition to the passing comment about the testimony from Gilliam's family members at the beginning of the penalty phase closing argument, defense counsel made only one other reference to this testimony during his five and one-half pages of argument. At one point defense counsel said:
I guess that is where the mitigating circumstances sort of come in. I'm a little bitI know lawyers spend a lot of time standing in front of juries and telling juries what they just heard. But, I simply refer you back to the testimony of Burley's mother and his children, to get some perspective of the type of upbringing he had, not as an excuse; at this juncture, there are no excuses. At this juncture, as I told you, your consideration is what is the appropriate penalty, appropriate in this life. Appropriate as punishment for him, because that should be your consideration; forget about rehabilitation. Rehabilitation is not a consideration at this point, punishment is.
Aside from not presenting the family witnesses during the penalty phase, counsel made no effort to refresh the jury's recollection of exactly what that evidence was or to guide them in how this evidence could be viewed by them. In fact, counsel seems to have simply thrown up his hands because in yet another portion of the argument he says:
Now, at this juncture there is probably nothing I could say to you that would influence how you think about that [a life sentence] as an appropriate penalty or how you feel about the death penalty. We discussed that quite extensively before any of you were selected. And, in the time that is allotted to us, it is inconceivable that anything I say will alter the views that you have brought *784 into the Courtroom concerning the appropriate penalty.
The fact that counsel in this instance not only failed to present relevant mitigating evidence to the penalty phase jury but also failed to effectively argue how the evidence that was presented should be used by the jury demonstrates a penalty phase performance that is below that which is expected of competent counsel. Furthermore, I cannot say that the proper presentation of this mitigating evidence might not have swayed other jurors[21] to vote in favor of a life recommendation. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
I believe that under the circumstances of this case, defense counsel was ineffective at the penalty phase and Gilliam should be allowed a new penalty phase before a new jury.
PARIENTE, J., concurs.
NOTES
[1] Gilliam was originally convicted in 1985. At that time Gilliam was represented by appointed counsel; however, after continual delays resulting from Gilliam's insistence on discharging counsel, Gilliam eventually proceeded pro se with the assistance of standby counsel. On appeal, this Court reversed Gilliam's conviction, finding error in the trial court's refusal to allow Gilliam to exercise his peremptory challenges at the completion of the State's jury selection. See Gilliam v. State, 514 So.2d 1098 (Fla.1987).
[2] The twenty-three claims were: (1) outstanding public records requests; (2) the trial court's erroneous exclusion of evidence indicating that the victim was a prostitute; (3) the State's violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (4) ineffective assistance of counsel during the guilt phase; (5) ineffective assistance of counsel during the penalty phase; (6) the instructions on aggravating circumstances failed to give the jury adequate guidance; (7) the statute setting forth aggravating circumstances is facially vague and overbroad; (8) an unconstitutional automatic aggravating circumstance; (9) an erroneous heinous, atrocious, or cruel finding (HAC); (10) the trial court's improper consideration of nonstatutory aggravating circumstances; (11) improper use of statutory rape conviction to support prior violent felony aggravator; (12) penalty phase jury instructions and arguments improperly diminished jury's sense of responsibility; (13) burden shifting penalty phase jury instructions; (14) the trial judge's failure to disqualify himself; (15) erroneous admission of Gilliam's statements; (16) failure to suppress physical evidence obtained from warrantless seizure; (17) the penalty phase jury instructions diminished the jury's sense of responsibility; (18) improper admission of hearsay testimony during the guilt phase; (19) the trial court's failure to find mitigating factors; (20) a bailiff's improper contact with the jury denied Gilliam a fair trial; (21) cumulative error; (22) the State's violation of Brady and presentation of misleading evidence; and (23) failure to obtain a competent mental health expert.
[3] Gilliam raises the following issues: (1) the trial court's erroneous decision to deny certain claims without providing for an evidentiary hearing; (2) failure to present certain evidence to the jury during the penalty phase; (3) failure to investigate and present additional mitigation evidence; (4) defense counsel's erroneous decision to introduce testimony regarding defendant's prior rape conviction; (5) failure to present an effective closing argument during the penalty phase; (6) failure to investigate and discover evidence of voluntary intoxication; (7) failure to obtain a competent mental health expert; (8) a Brady violation; (9) failure to request a jury instruction relative to epileptic seizures; (10) admission of improper hearsay evidence; (11) burden shifting penalty phase jury instructions; (12) an unconstitutional automatic aggravating circumstance; (13) the trial court's improper consideration of nonstatutory aggravating circumstances; (14) improper use of a statutory rape conviction to support the prior violent felony aggravator; (15) penalty phase jury instructions diminished the jury's sense of responsibility; (16) an erroneous penalty phase jury instruction; (17) the trial court's failure to find mitigating circumstances; (18) a bailiff's improper contact with the jury; (19) the instructions on aggravating circumstances failed to give the jury adequate guidance; (20) outstanding public record requests; (21) erroneous admission of Gilliam's statements; and (22) failure to suppress physical evidence from a warrantless seizure.
[4] The four claims are: (1) the trial court erred in finding HAC; (2) appellate counsel was ineffective for failing to raise the claim that the statute setting forth aggravating circumstances is vague and overbroad; (3) appellate counsel was ineffective in failing to raise the improper admission of hearsay testimony involving the prior rape conviction; and (4) appellate counsel was ineffective in failing to raise the trial court's exclusion of evidence indicating that the victim was a prostitute.
[5] Addressing the claims relative to the guilt phase first, claims 21 and 22 were properly denied as procedurally barred as they were raised and rejected by this Court on direct appeal. Gilliam, 514 So.2d at 1100

As to Gilliam's penalty phase claims, claims 11 through 19 are procedurally barred as they could have been raised on direct appeal.
[6] In claim 20 Gilliam claims that he has been denied the effective assistance of postconviction counsel because several public records requests remain outstanding. The lower court found that all of Gilliam's public records requests had been satisfied. Gilliam has not identified what records remain outstanding or any alleged error with the lower court's resolution of the instant claim. Accordingly, we deny relief.
[7] The following is a portion of the State's cross-examination on the issue:

[State]: Mr. Gilliam, isn't it true that on the day that individual, Vida Lester, was raped, you dragged her into a field, you choked her unconscious, you left her with a black eye and then you fled the scene?
[Gilliam]: No, ma'am.
[State]: That is not true?
[Gilliam]: No, ma'am.
[8] Koch was originally appointed in 1983 to represent Gilliam at his initial trial.
[9] Drs. Dinkla and Wilder testified that the accounts of Gilliam's alleged seizures from various hospital records and Gilliam's family members were most consistent with generalized seizures, not the complex-partial seizure Dr. Stillman opined Gilliam endured on the night of the murder.
[10] Specifically, both Burroughs and Morris testified that Gilliam did not smell of urine.
[11] Dr. Stillman testified that people who suffer seizures typically experience amnesia as to the events shortly before and after the seizure.
[12] Section 794.022 provides in pertinent part:

(2) Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution under s. 794.011. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease; or, when consent by the victim is at issue, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.
§ 794.022(2), Fla. Stat. (1987).
[13] Koch's announcement that he was relying on the testimony presented during the guilt phase came on the heels of the State's penalty phase case, where the only evidence the State presented was a certified copy of Gilliam's 1969 rape conviction in support of the prior violent felony aggravator. As did the defense, the State relied on the testimony adduced during the guilt phase:

[State]: At this stage of the proceedings, the State would be relying on the testimony of Dr. Rao, Souviron, Wilder, and the testimony of Mr. Walter Burt, with particularity to the issue raised in this trial.
[14] Gilliam's penalty phase took place on June 20, 1988. Following the penalty phase, the sentencing hearing was first rescheduled for July 6, 1988. At that time the trial court granted Koch's motion for continuance and the sentencing hearing was finally held on July 27, 1988.
[15] Cindy Gilliam married the defendant while he was in prison roughly six months prior to his second trial in 1988.
[16] This Court held the admission of the hearsay report of Gilliam's attack upon his infant son was harmless error. See Gilliam, 582 So.2d at 612.
[17] We rejected Gilliam's challenge to the applicability of the HAC aggravator on direct appeal:

We reject appellant's argument that the victim's consciousness was insufficiently proved. The medical examiner testified unequivocally that there was no injury to the victim's brain or the tissue surrounding it, that the victim died of strangulation, and that the victim's injuries were sustained while she was alive. The victim sustained numerous bruises to her upper arm, wrist, and leg from being grabbed. Furthermore, a woman's screams were heard in the vicinity at the time of the murder.
Gilliam, 582 So.2d at 611-12 (footnote omitted).
[18] The trial court found the following nonstatutory mitigation: (1) the defendant was brought up in a broken home and was subjected to physical abuse; and (2) the defendant's current wife, his mother, and other family members love him and desire that his life be spared.
[19] Cf. Gaskin v. State, 737 So.2d 509 (Fla. 1999) (reversing lower court's summary denial of Gaskin's claim that trial counsel's penalty phase closing argument was deficient in that it failed to address aggravating and mitigating circumstances where counsel presented extremely limited evidence during the penalty phase to the effect that "Gaskin was well-liked by everyone growing up, he worked hard at a lumber mill where he was employed and seemed to enjoy his job, and there was nothing about Gaskin's past or background that would have caused him to act violently or commit murder"); Clark v. State, 690 So.2d 1280 (Fla.1997) (holding trial counsel's penalty phase closing argument ineffective where counsel essentially distanced himself from the defendant during closing argument by attacking his character and seemingly invited the jury to impose the death sentence).
[20] In his first claim, Gilliam argues that the trial court erred in finding the HAC aggravator. We deny this claim to the extent Gilliam is attempting to use this habeas petition as a substitute or additional appeal of his postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) ("[C]laims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been raised on direct appeal or in a postconviction motion."). Further, this claim is procedurally barred as we rejected it on direct appeal. See Gilliam, 582 So.2d at 612.

In his second habeas claim, Gilliam argues that appellate counsel was ineffective in failing to argue that the statute setting forth aggravating circumstances is facially vague and overbroad. This claim is wholly without merit as the record reveals that the trial court read the defense's proposed HAC jury instruction, further narrowing the class of crimes to which the aggravator was applicable. The trial court did so in response to defense counsel's claim that the HAC instruction was vague and overbroad. Accordingly, appellate counsel cannot be deemed ineffective as the jury was instructed as the defense desired. See, e.g., Johnson v. Singletary, 695 So.2d 263, 266-67 (Fla.1996) (appellate counsel is not ineffective for failing to raise meritless claims).
In his penultimate habeas claim, Gilliam argues that appellate counsel was ineffective for failing to raise the admission of Detective Poe's hearsay testimony concerning the prior rape conviction. As discussed with reference to Gilliam's claim of ineffective assistance of counsel on the same ground, Poe's testimony was fairly circumscribed; at no point did Detective Poe relate the substance of any statements made by Lester to him. Accordingly, appellate counsel cannot be deemed ineffective because to the extent any inadmissible hearsay was admitted during Poe's testimony, any claim of prejudice arising therefrom would have been meritless.
In Gilliam's final habeas claim, he claims that appellate counsel was ineffective in failing to raise the trial court's exclusion of evidence indicating that the victim was a prostitute. Specifically, Gilliam contends that the rape shield law could not be used to limit his right to present a defense and confront the evidence against him. This Court has cautioned that the rape shield law must give way to constitutional rights to the extent it interferes with a defendant's confrontation rights or otherwise prevents a defendant from presenting a full and fair defense. See Roberts v. State, 510 So.2d 885, 892 (Fla.1987). However, the trial court's exclusion of the instant evidence did not interfere with these rights.
The evidence of the victim's alleged involvement in prostitution was of no relevance to Gilliam's insanity defense. The evidence amounted to an improper attack on the victim's character in violation of the rape shield law. Cf. Lewis v. State, 591 So.2d 922 (Fla. 1991) (finding error in the trial court's decision to preclude the defendant stepfather from inquiring into his minor stepdaughter's sexual activity with her boyfriend where the evidence was a relevant part of the stepfather's defense against charges of lewd and lascivious assault). Accordingly, appellate counsel cannot be deemed ineffective for failing to raise this issue as it is without merit. See Johnson, 695 So.2d at 266-67.
[21] The vote for death in this case was ten to two.